IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| | |
|---|---|
| JEREMIAH CLAY PRESTON, | Cause No. CV-07-0122-GF-SEH-RKS |
| Plaintiff, | |
| vs. | |
| | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE TO GRANT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| SHERIFF DAVID CASTLE, CAPTAIN DAN O'FALLON, NURSE PRACTITIONER LAURAL VANDERCHEK, CORPORAL BILL NEVINS, OFFICER MIKE DESSAULT, OFFICER WILLIAM KOMAR, and the CASCADE COUNTY BOARD OF COUNTY COMMISSIONERS, | |
| Defendants. | |

Plaintiff Jeremiah Clay Preston is a federal prisoner proceeding

pro se and in forma pauperis in this civil rights action filed pursuant to

42 U.S.C. § 1983 alleging a denial of medical care, excessive use of force, and a failure to train.  There is federal question jurisdiction pursuant to 28 U.S.C. § 1331.  Currently pending are Defendants' Motions for Summary Judgment (Court's Docs. 29 and 47).

I.  STANDARD

A party is entitled to summary judgment if they can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  That is, where the documentary evidence permits only one conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, it believes demonstrate the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest

upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

Anderson, 477 U.S. at 248.  The non-moving party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions.  Id.  Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment.  Id.

At the summary judgment stage, the judge's function is not to weigh the evidence or determine the truth of the matter, but to determine whether there is a genuine issue for trial.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50.

> The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

Anderson, 477 U.S. at 252.

In the context of a motion for summary judgment where a litigant

is proceeding pro se, the court has an obligation to construe pro se documents liberally and to afford the pro se litigant the benefit of any doubt.  Erickson v. Pardus, 551 U.S. 89, 127 S.Ct 2197, 2200 (2007) (per curiam); Baker v. McNeil Island Corrections Ctr., 859 F.2d 124, 127 (9th Cir. 1988).

## II.  STATEMENT OF FACTS

On December 22, 2002, Preston was involved in an incident at a jail in Colorado during which he was tazered by jail officials.  On February 25, 2003, Preston was seen by a neurologist, Dr. Richard Hughes of Denver Medical Center.  Dr. Hughes, according to Preston, diagnosed him as suffering from nerve damage.  (Court's Doc. 45: Preston Facts ¶ 1).  On July 15, 2004, Preston was seen by Dr. Bennett Machanic (a doctor with the Denver Injury Evaluation & Treatment Center in Colorado) for an independent medical examination.  Dr. Machanic diagnosed Preston as having "permanent impairment involving sensation on the left side of his body."  (Court's Doc. 45: Preston Facts ¶ 2 citing Court's Doc. 37, p. 36).

Preston was seen against on September 24, 2004 by Dr. Machanic

for a second independent medical examination.  Dr. Machanic prescribed the drug Neurontin to treat Preston's condition.  Dr. Machanic also advised Preston to contact a physician in Great Falls "for further institution of this medication."  (Court's Doc. 45:  Preston Facts ¶ 3 citing Court's Doc. 37, p. 39).

Preston contends he was on the drug Neurontin up until he entered Cascade County Detention Center ("CCDC") in August, 2008. (Court's Doc. 45:  Preston Facts ¶ 4, 22).  Defendant Andrechak's counsel subpoenaed all Preston's prescription records from every Great Falls pharmacy; no records were returned to show a prescription for Neurontin was ever filled by Preston in Great Falls.  (Court's Doc. 31: Andrechak Facts ¶ 36 citing Court's Doc. 31-17: Didriksen Affidavit).

Preston was an inmate at CCDC as a federal pretrial detainee from August 8, 2005 through August 10, 2006.  (Court's Doc. 27: Second Amended Complaint ¶ 11).

Upon entering CCDC on August 8, 2005, all inmates must go through an initial screening, which includes medical screening.  During that screening Preston informed the booking officer he had nerve

damage, was taking Neurontin, and was under the care of Dr. Bennett Machanic.  (Court's Doc. 45: Preston Facts ¶ 6 citing Court's Doc. 45-1).

Defendant Laurel Andrechak worked as the Medical Director for Spectrum Medical at CCDC during Preston's incarceration at CCDC. (Court's Doc. 31: Andrechak Facts ¶ 2 citing Court's Doc. 38-1: Andrechak Affidavit ¶ 2).  At the time, Andrechak was a certified family nurse practitioner.  (Court's Doc. 31:  Andrechak Facts ¶ 2 citing Court's Doc. 38-1: Andrechak Affidavit ¶ 2).

Preston had direct communication with Andrechak on numerous occasions regarding the need for necessary medications.  (Court' s Doc. 45: Preston Facts ¶ 7).  Preston was told verbally by Andrechak that it would take a little while to receive necessary medication.  (Court' s Doc. 45: Preston Facts ¶ 8).

Preston was seen on October 6, 2005 by CCDC medical staff, including Defendant Andrechak, and reported having numbness and tingling on the left side of his body from his shoulder to his knee as a result of being "tazed."  He also reported he was on Neurontin.  (Court's Doc. 45: Preston Facts ¶ 9 citing Court's Doc. 45-2, p. 2: October 6, 2005

Medical Progress Note).  The Medical Progress Notes indicates Preston

reported he was on Neurontin for his numbness with no improvement.

(Court's Doc. 45-2: October 6, 2005 Medical Progress Note).

On November 10, 2005, Preston had a spasmodic episode which

caused a laceration to the back of his head requiring three staples to

close.  (Court's Doc. 45: Preston Facts ¶ 10 citing Court's Doc. 45-3, p. 2:

November 10, 2005 Medical Progress Note).  The November 10, 2005

Medical Progress Note, signed by Andrechak, states Preston was

located on the ground face-up and semi-awake.  The note indicated

Preston stated he was looking out the window and fell back, he had

been to the dentist earlier, and he had no breakfast.  (Court's Doc. 45-3,

p. 2: November 10, 2005 Medical Progress Note).

On November 16, 2005, Preston's sent a request for Neurontin,

stating, "I have been taken [sic] Neurontin.  I was up to 4,500 mg a day,

I was getting ready to switch to Lamictal.  I need to be taking those as

many times a day as the prescription says.  Would you please get in

contact and get me my medication.  Thank you."  (Court's Doc. 31:

Andrechak Facts ¶ 8; Court's Doc. 45:  Preston Facts ¶ 11 both citing

Court's Doc. 31-6 November 16, 2005 kite).

Two days later, Preston's kite was returned and stated "we have your signed Release for Medical Records from Denver.  The provider will review those records."  (Court's Doc. 31: Andrechak Facts ¶ 8 citing Court's Doc. 31-6 November 16, 2005 kite).

Preston's medical release was faxed to Denver Injury Evaluation & Treatment Center, Ltd., the same day.  (Court's Doc. 31: Andrechak Facts ¶ 10 citing Court's Doc. 37, p. 29; Court's Doc. 38-1: Andrechak Affidavit ¶ 6).

Upon receipt, Andrechak reviewed the records from Denver which included intake forms and two "Independent Medical Examinations" performed by Dr. Bennett Machanic, a neurologist.  Andrechak does not recall ever seeing a prescription for Neurontin within the Denver Injury Evaluation & Treatment Center records.  (Court's Doc. 31: Andrechak Facts ¶ 12 citing Court's Doc. 37, pp. 31-39; Court's Doc. 38-1: Andrechak Affidavit ¶ 6).  Preston provided in discovery a prescription for Neurontin from Dr. Machanic dated September 24, 2004.  The prescription was for 35 pills of 300 mg Neurontin, to be

taken, one pill at bedtime.  (Court's Doc. 37, p. 66).

On December 7, 2005, Preston had an attorney fax a letter to Captain Dan O'Fallon explaining that Preston had prescription medication which was not being given to him.  (Court's Doc. 45: Preston Facts ¶ 13 citing Court's Doc. 45-5, pp. 2-3).

Preston submitted a medical request on December 14, 2005 indicating he still had not received his medication for his nerve damage.  Andrechak responded, "After reviewing your neurology records I feel you need to wait until you get to fed prison where a neurologist can get you back on those meds if need be."  (Court's Doc. 45: Preston Facts ¶ 14 citing Court's Doc. 31-6: December 14, 2005 kite).

Preston submitted a grievance form on December 21, 2005 stating he had advised medical of his permanent nerve damage and that he needed his medication.  The grievance officer responded on December 28, 2005 stating, "Denied.  The medication is NOT authorized for use in this facility.  Kite the U.S. Marshals about being moved to a different facility to receive the medication."  (Court's Doc. 45-6: December 21,

2005 Grievance).

On January 15, 2006, Preston had another spasmodic episode which caused Preston to urinate on himself. (Court's Doc. 45: Preston Facts ¶ 16). The January 15, 2006 medical progress note indicates an inmate notified the guards that Preston looked like he passed out. When Preston was examined by medical staff he indicated he felt weak and then hit the floor. The medical notes verify Preston urinated on himself. That night Preston refused his dinner stating he was not going to eat until he got his meds for psuedo-seizures. (Court's Doc. 45-7, p. 2: January 15, 2006 Medical Progress Note).

After Preston went on a hunger strike, Andrechak again reviewed his medical records. She noted Preston's condition, as found by Dr. Machanic, was "permanent and stationary." She noted that her review led her to believe Preston never sought a local Great Falls physician to assist him with treatment for his claimed nerve damage, despite being ordered to by Dr. Machanic. She also concluded that before this incarceration in CCDC, Preston had not been on medication for "quite a while and the ones that were tried did not work." (Court's Doc. 31:

Andrechak Facts ¶ 16 citing Court's Doc. 37, p. 55: January 16, 2006 Medical Progress Note).

On January 25, 2006, a CCDC inmate was assaulted by another inmate and sustained physical injuries necessitating transport to the Benefis Emergency Room. (Court's Doc. 50: County Facts ¶ 2 citing Court's Doc. 50-1: Incident Report of Officer Zinne).

As a result of the assault, there was a heightened level of security in CCDC. The initial reports indicated Preston was suspected of the assault on the inmate. Detention Officers Nevins, Dussault, and Komar went to Preston's cell to question him regarding the assault. (Court's Doc. 50: County Facts ¶ 3-5 citing Court's Doc. 50-2: Nevins's Response to Preston's Interrogatory No. 15; Court's Doc. 57: Preston Facts ¶ 10).

Preston told the officers he had nothing to say to them or anyone else for that matter and could they please leave. (Court's Doc. 57: Preston Facts, ¶ 12). Officers Dussault and Nevins entered Preston's cell and observed Preston wiping his hands with toilet paper. Officer Nevins observed that one of Preston's knuckles was reddish-purple,

swollen, and cut. (Court's Doc. 50: County Facts ¶¶ 6-7 citing Court's Doc. 50-3: Nevins's Incident Report).

The Officers gave several direct orders to Preston to show them his hands, but all orders were refused. (Court's Doc. 50: County Facts ¶ 8 citing Court's Doc. 50-2:  Defendant Nevins' Response to Preston's Interrogatory No. 15; Court's Doc. 50-3:  Incident Report of Officer Nevins).

At that point, Preston's cell mate, Rick Stinson, jumped off his bunk and approached the Detention Officers in a threatening manner. (Court's Doc. 50: County Facts ¶ 9 citing Court's Doc. 50-3 and 50-4: Incident Reports of Nevins and Dussault).

Officer Nevins sprayed Stinson with OC pepper spray and then sprayed Preston as he moved towards Officer Nevins.  Notwithstanding the OC pepper spray, Stinson was able to assault Officer Nevins, gain control of the OC spray, and spray the Detention Officers.  After a brief struggle, the OC spray was retrieved and both inmates were secured. (Court's Doc. 50: County Facts ¶¶ 10-12 citing Court's Doc. 50-2: Defendant Nevins's Response to Preston's Interrogatory No. 15; Court's

Doc. 50-3 and 50-4: Incident Reports of Nevins and Dussault).

Preston contends the pepper spray was used because Preston refused an order to handcuff up.  (Court's Doc. 57: Preston Facts ¶ 25).

Twenty to thirty minutes after the incident, Preston was decontaminated and was able to rinse his eyes out. (Court's Doc. 50: County Facts ¶ 13 citing Court's Doc. 50-5: Incident Report of Officer Walter; Court's Doc. 57: Preston Facts ¶ 19).

On January 27, 2006, Preston made a written complaint of a floating black spot in his eye.  He was treated by CCDC medical staff and ultimately seen on several occasions by a local ophthalmologist, Dr. Skinner.  In his note dated April 3, 2006, Dr. Skinner stated Preston's condition "appears to have resolved."  (Court's Doc. 50: County Facts ¶¶ 15-19 citing Court's Doc. 37, pp. 9-15; Court's Doc. 54-3, p. 1).  Preston contends he still suffers from the black floating image in his left eye. (Court's Doc. 57: Preston Facts ¶ 33).

On March 1, 2006, Preston attempted to hang himself with his underwear.  Andrechak examined Preston but he refused to communicate with medical staff.  (Court's Doc. 31: Andrechak Facts ¶¶

19-20 citing Court's Doc. 37, p. 57: March 1, 2006 Medical Progress
Note).  On March 1, 2006, Preston told guards he was on a hunger
strike.  Preston continued on this hunger strike until dinner on March
6, 2006.

On March 6, 2006, Preston attended his change of plea hearing in
a wheel chair.  Judge Haddon was skeptical of Preston's appearance in
the wheel chair and ordered the U.S. Marshals to have Preston
examined and provide him with a full report on Preston's physical
abilities.  (Court's Doc. 31: Andrechak Facts ¶¶ 22-23).

Preston was examined by Dr. Engbrecht on March 24, 2006.  Dr.
Engbrecht's assessment indicated, "paresthesias left side, and there is
evidence here clinically, I believe of symptoms magnification.  I cannot
quantify his nerve function here, and I think he needs an EMG."  Dr.
Engbrecht referred Preston to Dr. Astle to conduct an EMG/EKG nerve
study.  (Court's Doc. 37, p. 25: Engbrecht report).

Dr. Astle conducted those tests on Preston on April 6, 2006.  The
summary of Dr. Astle's findings as follows:  "Motor and sensory nerve
conduction studies revealed normal distal latencies, amplitudes and

conduction velocities for left median and ulnar nerves.  F-wave

latencies were within the normal limits for all nerves tested.  Motor

nerve conduction studies revealed normal distal latencies and

conduction velocities of bilateral tibial and peroneal nerves.  Sensory

nerve conduction studies revealed normal peak latencies and

amplitudes for bilateral sural nerves.  No significant side to side

difference was noted."  (Court's Doc. 37, p. 21: Astle report).

Dr. Astle's impression was as follows:  "The above

electrodiagnostic study reveals no evidence of carpal tunnel syndrome.

The above electrodiagnostic study reveals no evidence of peripheral

neuropathy."  (Court's Doc. 37, p. 22:  Astle report)

Preston is currently taking 2000 mg a day of Gabapentin (generic

name for Neurontin) for permanent nerve damage and spasmodic

epidsodes.

## III.  ALLEGATIONS

Three claims are before the Court.  Preston's first claim, as

supplemented in the Amended Complaint, alleges Defendants Laural

Vanderchek, Captain O'Fallon, Sheriff David Castle, and the Cascade

County Board of County Commissioners failed to provide adequate medical care and treatment in violation of the Fourteenth and Eighth Amendments.  Preston alleges between August 8, 2005 and August 10, 2006, these Defendants knowingly and with deliberate indifference denied Preston the medication Neurontin (and any alternative) for treatment of Preston's permanent nerve damage.  Preston alleges this denial of treatment caused his condition to worsen and caused him to suffer physical and mental pain.

Preston's second claim for relief is against Defendants Nevins, Dessault, and Komar for excessive use of force in violation of the Fourth, Eighth and Fourteenth Amendments.

Preston's third claim for relief is against Defendants Sheriff David Castle and the Board of County Commissioners for failure to train and supervise in violation of the Eighth and Fourteenth Amendments.

## IV.  ANALYSIS

### A.  Denial of Medical Care

A pretrial detainee's challenge to conditions of confinement are

evaluated under the Due Process Clause of the Fourteenth Amendment.  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001); Redman v. County of San Diego, 942 F.2d 1435, 1440 (9th Cir. 1991) (en banc), cert. denied, 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1991); and Lolli v. County of Orange, 351 F.3d 410, 418-19 (9th Cir. 2003).  The Fourteenth Amendment's Due Process Clause establishes that "detainees have a right against jail conditions or restrictions that 'amount to punishment.'"  Pierce v. County of Orange, 526 F.3d 1190, 1205 (9th Cir. 2008).  Because a pretrial detainee's rights under the Fourteenth Amendment are comparable to the rights of prisoners under the Eighth Amendment, the Ninth Circuit has applied Eighth Amendment medical care standards to claims brought by pretrial detainees.  See Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

The Eighth Amendment requires that prisoners receive adequate medical care, including mental health care.  Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Technologies, Inc. v.

Miller, 104 F.3d 1133 (9th Cir. 1997).  To state an arguable section 1983 claim for failure to provide medical care, a prisoner must allege a defendant's "acts or omissions [were] sufficiently harmful to evidence a deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106; Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986), cert. denied, 481 U.S. 1069 (1987).

Deliberate indifference under the Eighth Amendment involves the consideration of two elements:  "[1] the seriousness of the prisoner's medical need[;] and [2] the nature of the defendant's response to that need." McGuckin, 974 F.2d at 1059; see also Lolli v. County of Orange, 351 F.3d 410, 419 (9th Cir. 2003).  That is, a plaintiff must demonstrate "'objectively, sufficiently serious' harm and that the officials had a 'sufficiently culpable state of mind' in denying the proper medical care. Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation." Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002)(citing Wallis v. Baldwin, 70 F.3d 1074, 1076 (9th Cir. 1995)).

The objective component of deliberate indifference requires the

showing of a serious medical need.  "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain'." McGuckin, 974 F.2d at 1059 (9th Cir. 1992) (quoting Estelle, 429 U.S. at 104); see also Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed."  Estelle, 429 U.S. at 104-105.

    The subjective component of deliberate indifference considers the nature of the defendant's response to the serious medical need and whether the defendant had a culpable mental state, which is "'deliberate indifference' to a substantial risk of serious harm." Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998)(quoting Farmer v. Brennan, 511 U.S. 825, 835 (1994)).  "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer,

511 U.S. at 837.  "[T]he official's conduct must have been 'wanton,' which turns not upon its effect on the prisoner, but rather, upon the constraints facing the official." Frost, 152 F.3d at 1128 (quoting Wilson v. Seiter, 501 U.S. 294, 302-303 (1991)).  "This second prong-defendant's response to the need was deliberately indifferent-is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 citing McGuckin, 974 F.2d at 1060.  "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Id.

Preston does not dispute that Andrechak regularly examined him. He does not dispute that she was responsive to his requests for medical assistance by arranging for dentist appointments, eye examinations, and providing regular day-to-day oversight of his medical condition.

The undisputed testimony of Defendant Andrechak is she thoroughly reviewed Preston's situation on a number of occasions.  She obtained Preston's prior medical records from the Denver Injury

Evaluation & Treatment Center specifically requesting a list of current medications.  Andrechak does not recall seeing a prescription for Neurontin in those records.  Andrechak reviewed the neurology records and did not find sufficient clinical reasons to prescribe Neurontin for Preston.  In addition, there were no objective signs of muscle or nerve limitations.  Andrechak saw Preston walk around K-pod without any noticeable impairment and saw him move both arms without limitation on multiple occasions.  She witnessed him do chin-ups and other exercises without any noticeable impairment.  Andrechak testified she had no verifiable evidence that Preston ever had a prescription for Neurontin.  (Court's Doc. 31: Andrechak Affidavit ¶ 14).

Andrechak also based her decision not to prescribe Neurontin on her conversations with Preston.  He complained of pain in his shoulder when he requested Neurontin and she provided him analgesics, such as ibuprofen, Tylenol, and Excedrin.  (Court's Doc. 31: Andrechak Affidavit ¶ 15).

Moreover, when Preston was examined by Drs. Engbrecht and Astle, his alleged condition could not be verified.

In contrast, Preston presented a year old IME report and prescription but no evidence of continuing care after that examination. While he presented evidence of two episodes when he passed out, he presented no concrete evidence of the need for this medication.

While there may be a difference of opinion regarding the need for Neurontin to treat Preston's condition, that is insufficient to establish deliberate indifference.  Dissatisfaction or disagreement with the type and adequacy of the medical treatment is insufficient to state a Constitutional claim for deliberate indifference.  It is well established that a difference of opinion over the proper course of medical treatment does not give rise to a cause of action under the Eighth Amendment. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989) (citing Estelle, 429 U.S. at 107).

Under these undisputed facts, there is no evidence of deliberate indifferent to a serious medical need.  Summary judgment for Defendants regarding Preston's medical care is appropriate.

B.  Excessive Use of Force

Preston is correct that since he was a pretrial detainee at the time

of the use of force incident, it is the Fourth Amendment which governs

this analysis, not the Eighth Amendment as cited by the County

Defendants.  See Lolli v. County of Orange, 351 F.3d 410, 415 (9th Cir.

2003)(citing Gibson v. County of Washoe, 290 F.3d 1175, 1197 (9th Cir.

2002)( "[T]he Fourth Amendment sets the applicable constitutional

limitations for considering claims of excessive force during pretrial

detention.").  "[T]he 'reasonableness' inquiry in an excessive force case

is an objective one: the question is whether the officers' actions are

'objectively reasonable' in light of the facts and circumstances

confronting them, without regard to their underlying intent or

motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104

L.Ed.2d 443 (1989).  In considering an excessive force claim, the Court

must balance "the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing

governmental interests at stake." Lolli, 351 F.3d at 415 (citing

Graham, 490 U.S. at 396, 109 S.Ct. 1865).

Graham instructs the Court to pay careful attention to the facts of

the particular case, including "'the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight'," although "[i]n the context of pretrial detention rather than arrest, it is clear that all the factors mentioned in Graham . . . will not necessarily be relevant." Gibson, 290 F.3d at 1197 & n. 21 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865). In addition, the use of pepper spray, "may be reasonable as a general policy to bring an arrestee under control." Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002)(quoting LaLonde v. County of Riverside, 204 F.3d 947, 961 (9th Cir. 2000).

Under the undisputed facts in this case, the Court cannot say the force utilized in this case was excessive. Preston was suspected in a severe beating of another inmate. He does not dispute that Officer Nevins saw him wiping his hands and one of his knuckles was reddish-purple, swollen, and cut. He does not dispute that he was refusing the officers orders to handcuff up. Further he does not dispute that his cellmate, Rick Stinson, got out of his bunk a couple of times and had to

be ordered to sit down.  Preston does not dispute that after Stinson complied by sitting down as instructed on two occasions he jumped off the bunk and approached Nevins in what Nevins felt was a threatening manner.

The situation described by both parties was a tense and volatile scene where one inmate had been brutally assaulted and the Officers were attempting to question Preston regarding that incident.  Preston was admittedly refusing to comply with the officers' instructions. Preston was suspected of a serious crime (the assault of another inmate), was resisting detainment, and refusing to comply with the officers' instructions.  Officer Nevins utilized a minimal amount of force in spraying the OC spray.  The Court cannot say the use of OC spray in this instance was excessive.

The next question is whether leaving Preston contaminated with OC spray for 20-30 minutes constituted excessive force.  Jail officials may be deliberately indifferent to an inmate's serious medical needs if they are aware of the harmful effects of pepper spray and yet purposefully refuse to provide showers or medical care.  Clement v.

Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

Again, the Court must take into account the situation at hand.  In the course of questioning Preston, his cellmate Stinson took the OC spray from Officers Nevins and sprayed Officers Nevins, Dussault, and Komar.  Officer Komar had to be taken to a medical facility as he was allergic to OC-10 and was having a negative reaction.  According to the incident reports, after the incident Preston and his cellmate were locked down while the scene was secured and medical attention was administered to the officers and the other inmate.  Officer Walter assisted in securing Preston and Stinson but since Stinson was kicking the door and window of the room he was in, he had to be moved to a rubber room.  Thereafter, Officer Walter escorted Preston to the shower in the booking.

Preston presented no evidence that any named Defendant purposely delayed decontamination.  Summary judgment should be granted.

C.  Failure to Train

As there is no constitutional violation against the underlying

officers, there is no need in this case to evaluate whether their supervisory officers had unconstitutional custom, policy, or practices such as inadequate training.  If there was no constitutional violation of Preston's rights, there is "no basis for finding the officers inadequately trained."  Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights.  Here, the municipal defendants cannot be held liable because no constitutional violation occurred.").

## V.  CONCLUSION

Preston's claims against Defendants are insufficient to survive summary judgment.  Preston failed to produce sufficient evidence to overcome the undisputed evidence presented by Defendants.

### A.  Certification Regarding Appeal

The Federal Rules of Appellate Procedure provide as follows:

[A] party who was permitted to proceed in forma pauperis in the district-court action, or who was determined to be financially unable to obtain an adequate defense in a criminal case, may proceed on appeal in forma pauperis without further authorization, unless:
(A) the district court-before or after the notice of appeal is

filed-certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis and states in writing its reasons for the certification or finding;

Fed.R.App.P. 24(a)(3)(A).

Analogously, 28 U.S.C. § 1915(a)(3) provides "[a]n appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith."  The good faith standard is an objective one. See Coppedge v. United States, 369 U.S. 438, 445 (1962).  A plaintiff satisfies the "good faith" requirement if he or she seeks review of any issue that is "not frivolous."  Gardner v. Pogue, 558 F.2d 548, 551 (9th Cir. 1977) (quoting Coppedge, 369 U.S. at 445).  For purposes of section 1915, an appeal is frivolous if it lacks any arguable basis in law or fact. Neitzke, 490 U.S. at 325, 327; Franklin v. Murphy, 745 F.2d 1221, 1225 (9th Cir. 1984).  "[T]o determine that an appeal is in good faith, a court need only find that a reasonable person could suppose that the appeal has some merit."  Walker v. O'Brien, 216 F.3d 626, 631 (9th Cir. 2000).

No reasonable person could suppose an appeal would have merit. Therefore, the Court should certify that any appeal of this matter would not be taken in good faith.

FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE TO GRANT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT–CV-07-00122-GF-SEH-RKS / PAGE 28

B.  Address Changes

At all times during the pendency of this action, Preston SHALL IMMEDIATELY ADVISE the Court of any change of address and its effective date.  Such notice shall be captioned "NOTICE OF CHANGE OF ADDRESS."  The notice shall contain only information pertaining to the change of address and its effective date, except if Preston has been released from custody, the notice should so indicate.  The notice shall not include any motions for any other relief.  Failure to file a NOTICE OF CHANGE OF ADDRESS may result in the dismissal of the action for failure to prosecute pursuant to Fed.R.Civ.P. 41(b).

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motions for Summary Judgment (Court's Docs. 29 and 47) should be GRANTED.

2.  The Clerk of Court should be directed to close this matter and enter judgment in favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

3.  The Clerk of Court should be directed to have the docket

reflect that the Court certifies pursuant to Fed.R.App.P. 24(a)(3)(A) that any appeal of this decision would not be taken in good faith. No reasonable person could suppose an appeal would have merit.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Preston may serve and file written objections to these Findings and Recommendations within ten (10) business days of the date entered as indicated on the Notice of Electronic Filing. Any such filing should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

A district judge will make a de novo determination of those portions of the Findings and Recommendations to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendations. Failure to timely file written objections may bar a de novo determination by the district judge and may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

This order is not immediately appealable to the Ninth Circuit

Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1), should not be filed until entry of the District Court's final judgment.

DATED this 19th day of November, 2009.

/s/ Keith Strong
Keith Strong
United States Magistrate Judge